UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re:<br><br>Rao Kilaru,<br><br>    Debtor.<br>_____<br><br>Financial Pacific Leasing, LLC,<br><br>    Plaintiff,<br>v.<br><br>Rao Kilaru,<br><br>    Defendant.<br>_____ | Case No. 13 B 23734<br>Chapter 7<br>Judge Bruce W. Black<br><br><br><br><br><br>Adversary No. 14 A 00066 |

**MEMORANDUM OPINION**

This matter is before the court on the complaint of Financial Pacific Leasing, LLC ("FPL") filed against Dr. Rao Kilaru (the "Debtor") to determine the dischargeability under 11 U.S.C. § 523(a)(2)(B)[1] of the debt owed to FPL. Pursuant to Rule 15(b) of the Federal Rules of Civil Procedure, made applicable by Rule 7015 of the Federal Rules of Bankruptcy Procedure, FPL has moved to amend the complaint after trial to include a count alleging the debt nondischargeable under 11 U.S.C § 523(a)(2)(A). After a trial on the merits, for the reasons stated herein, judgment in favor of FPL will be entered.

**I. JURISDICTION**

The Bankruptcy Court for the Northern District of Illinois has jurisdiction to decide this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois. This proceeding is a core matter in which this

---

[1] 11 U.S.C. § 101 *ff.* Any reference to "section" or "the Code" is a reference to the Bankruptcy Code unless another reference is stated.

1

court has constitutional authority to enter final orders under 28 U.S.C. § 157(b)(2)(A), and (I).

## II. BACKGROUND

The Debtor filed his chapter 7 bankruptcy petition on June 7, 2013. Prior to filing, the Debtor was involved in numerous business enterprises, three of which are relevant to this proceeding: PeopleFirst Bank ("PeopleFirst"); Prairie Emergency Services, S.C. ("Prairie"); and National Center for Integrated Medicine, LLC ("NCIM"). The Court will briefly explain each entity before addressing the transaction that led to the present adversary proceeding.

### A. Debtor's Business

The Debtor was a founder of PeopleFirst. In 2011, he was the chairman of the board of directors of PeopleFirst. The Debtor testified that in this capacity, he, and the rest of the board, would review loan applications that requested an excess of $500,000 after the application was approved by the bank's loan committee. The Debtor explained that from 2006 to 2012, when the Debtor sat on the board, the board reviewed about 1 or 2 loan applications a month. The Debtor claimed to have reviewed between 75 and 100 loan application while on the board. As a director the Debtor was also required to submit a yearly personal financial statement to the bank. The Debtor testified that he has done so for 15 to 20 years. In the spring of 2011, the Debtor, with the help of PeopleFirst President and Chief Executive Officer, David Stanton, prepared a personal financial statement for PeopleFirst. *See* FPL Ex. 6 (hereinafter the "PFS"). The PFS is the subject of this adversary proceeding.

Prairie, which began in 1997, provided emergency medical services to Provena Saint Joseph Hospital in Joliet, Illinois ("Provena"), subject to Provena's continued approval. The Debtor held a majority interest in Prairie. Provena and Prairie would renegotiate their agreement approximately every three years. In October of 2011, however, Provena decided not to renew the

agreement. The Debtor testified that he was part of the committee at Provena that selected a new company and that the selection process occurred in either August or September of 2011. The Debtor further testified that he learned of the cancelation two or three months prior to the contract's expiration in October. Dr. Ross Tannebaum, one of the Debtor's colleagues at Prairie, however, stated that he learned of the termination six months to a year prior to the contract's expiration. Dr. Tannebaum further stated that he learned of this from various sources, but could not remember whether it was from the Debtor or at a meeting between Provena's Chief Executive Officer and the emergency physicians at the hospital that occurred in either spring or summer of 2011. Ultimately, the contract's expiration led to Prairie filing for bankruptcy.

NCIM was the latest business that the Debtor attempted to establish. The Debtor obtained numerous loans to help finance NCIM. Among these loans, and the subject of this adversary proceeding, was a lease made by Brickhouse Small Business Lending, LLC ("Brickhouse"). Brickhouse provided financing in the amount of $75,000.00 to Prairie for the lease of medical equipment. At trial, however, the Debtor revealed that he merely used Prairie as a means to get the medical equipment for NCIM. The Debtor stated that no lending company would give credit to a new company with no credit history, so he used Prairie's name when he applied. The Debtor claimed that Brickhouse, and by extension FPL to whom Brickhouse assigned the lease, knew that NCIM was the ultimate beneficiary of the financing for the lease. However, no documents supporting this claim were produced at trial, nor could the Debtor recall if any existed.

### B. Lease Application

In the spring of 2011, the Debtor approached Brickhouse for financing for Prairie.[2]

---

[2] Under the agreement, Prairie leased certain medical equipment from Brickhouse. However, during the trial, the terms "lease" and "loan" were used interchangeably. The Court does not, and need not, make a determination as to the characterization of this transaction. Regardless of the terminology, this was still a matter of the Debtor/Prairie obtaining financing. The Court will use the term "lease" to describe this transaction.

3

Brickhouse was a broker for FPL. At trial, Alan Kissinger, FPL's Vice-President and Senior Credit Officer and the FPL official who worked on this agreement, explained that Brickhouse originates agreements and then presents them to FPL for approval. If FPL approves the deal then Brickhouse approves the agreement and assigns it to FPL.

As part of the application, Brickhouse/FPL required the Debtor to sign a personal guaranty, and the Debtor was required to provide a personal financial statement to Brickhouse/FPL. The Debtor submitted the PFS that he had prepared for PeopleFirst. The PFS indicated that the Debtor had $10,272,000.00 in assets and $4,111,000.00 in liabilities. Thus, the document indicated a net worth of about $6,161,000.00. The Debtor described these values as a good faith estimate of his assets and liabilities. Based on the information provided, financing was approved on May 6, 2011.

On June 7, 2013, the Debtor filed his Chapter 7 bankruptcy petition. The Debtor's schedules, however, were strikingly different from what the Debtor had listed in the PFS. As a result of the difference, FPL brought this adversary proceeding to find its debt nondischargeable under section 523(a)(2)(B). On December 14 and 15, 2015 the Court held a two-day trial on the merits.

### III. DISCUSSION

During the trial FPL learned that the Debtor used Prairie as a means to get financing for NCIM. As a result, FPL has moved under Rule 15(b) of the Federal Rules of Civil Procedure to amend their complaint to include a count under section 523(a)(2)(A).

#### A. Section 523(a)(2)(B)

Section 523(a) provides that a discharge under section 727 does not discharge an individual debtor from certain obligations. Under section 523(a)(2)(B) debt is not dischargeable

4

to the extent it was obtained by use of a written statement "(i) that is materially false; (ii) respecting the debtor's . . . financial condition; (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and (iv) that the debtor caused to be made or published with intent to deceive[.]"[3] § 523(a)(2)(B). A creditor alleging a debt to be nondischargeable under section 523(a)(2)(B) must establish these four elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290 (1991). Moreover, "exceptions to discharge are to be construed strictly against a creditor and liberally in favor of the debtor." *Goldberg Sec., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7th Cir. 1992) (citations omitted).

### 1. Materially False

For a debt to be nondischargeable under section 523(a)(2)(B) the information provided in the PFS must be materially false. "Material falsity has been defined as 'an important or substantial untruth.'" *In re Bogstad*, 779 F.2d 370, 375 (7th Cir. 1985) (citation omitted); *see also Community Bank of Homewood v. Bailey (In re Bailey)* 145 B.R. 919, 930 (Bankr. N.D. Ill. 1992) ("A statement is materially false for purposes of § 523(a)(2)(B) if it 'paints a substantially untruthful picture of a financial conditions [sic] by misrepresenting information of the type which would normally affect the decision to grant credit.'"). Moreover, "[t]he omission, concealment, or understatement of liabilities will ordinarily constitute a materially false statement." 4 COLLIER ON BANKRUPTCY ¶ 523.08 (15th ed. 2015) (collecting cases). The evidence at trial overwhelming showed that the Debtor's PFS was materially false.

As mentioned earlier, in 2010 and 2011, the Debtor was attempting to establish NCIM as a viable business. The Debtor testified that on October 28, 2010, the Debtor personally

---

[3] Even though the Debtor only published the PFS to Brickhouse, FPL, as Brickhouse's assignee, can step into Brickhouse's shoes to pursue the § 523(a)(2) cause of action. *See Bombardier Capital Inc. v. Dobek (In re Dobek)*, 278 B.R. 496, 508 (Bankr. N.D. Ill. 2002).

guaranteed a loan from Wells Fargo Bank, N.A. to NCIM. Subsequently, on December 9, 2010, the Debtor personally guaranteed another loan, this time from US Bank, N.A. to NCIM. Neither loan appears on the Debtor's PFS, which was created in the spring of 2011.

Moreover, nearly every single item listed on the PFS was incorrect. Specifically:

- PeopleFirst account holding $225,000.00 in cash. At trial the Debtor stated that the figure was a total of four or five different accounts the Debtor had at PeopleFirst. However, the only account that was presented at trial showed a joint-checking account that the Debtor held with his wife. As of February 10, 2011 the balance was $6,397.58. The balance was $13,472.23 as of March 10, 2011.

- Non-Readily Marketable Securities valued at $1,052,000.00. The Debtor's bankruptcy schedules, however, only list 25,000 shares in PeopleFirst Bank valued at $10/share. The discrepancy, according to the Debtor, was because he included shares that belonged to his wife on his PFS. Therefore, the Debtor's interest in the shares was only $250,000.00.

- Real estate located at 305 Westridge Rd., Joliet, Illinois valued at $850,000.00, subject to a $400,000.00 mortgage, and therefore an asset of $450,000.00. The property was actually held in joint tenancy with the Debtor's wife, and a December 2010 appraisal of the property valued it at $750,000.00. The Debtor provided no explanation for the significant increase in value. Finally, the mortgage on the property was actually $493,000.00. The Debtor's half interest in the property, therefore, was valued at $375,000.00. Finally, after deducting the full value of the mortgage of $493,000.00, which the Debtor was responsible for, the property was actually a liability of $118,000.00.

- Real estate located at 505 N. Lake Shore Dr., Unit 5002, Chicago, Illinois valued at $1,750,000.00, subject to $1,161,000.00 mortgage, and therefore an asset of $589,000.00. At

6

trial, the Debtor testified that a trust, to which his wife was the sole beneficiary, actually owned the property, but he was still responsible for the mortgage. Therefore, this was actually a $1,161,000.00 liability.

- Real estate located at 2900 Theodore Ave, Joliet, Illinois valued at $1,200,000.00 and unencumbered. The Debtor's schedules, however, value the property at $500,000.00. Although the Debtor stated that there was no significant change to the property from the creation of the PFS to the Debtor's bankruptcy filing, he stated that the $1,200,000.00 value was based on an appraisal that occurred in 2010. The Debtor failed, however, to produce such an appraisal during discovery or at trial. Moreover, the property was actually owned by Equimed Plaza, LLC, another company that the Debtor owned, and was subject to a mortgage. Therefore, the Debtor's interest in the property, if any, was most likely less than $500,000.00.

- Real estate located at 3100 Theodore Ave, Joliet, Illinois valued at $3,300,000.00, subject to $2,550,000.00 mortgage, and therefore a $750,000.00 asset. At trial, the evidence showed that the mortgage in March of 2011 was actually just under $3,300,000.00. Moreover, Kilaru, LLC, yet another one of the Debtor's companies, was the owner of the real estate. As such, regardless of ownership, there was little value in this property.

- Hilton Timeshare valued at $75,000.00. No such timeshare was included on the Debtor's bankruptcy schedules, nor did the Debtor produce any documents evidencing ownership of any timeshare during discovery or trial.

- Debtor's ownership interest in Prairie valued at $1,200,000.00. The Debtor explained that he got this figure by multiplying his 60% interest in Prairie by Prairie's yearly accounts receivable of about $2,000,000.00. However, the Debtor provided no supporting

7

documentation of said accounts receivable during discovery or at trial. Moreover, there was some indication at trial that the Debtor may have known that Provena would not be renewing Prairie's contract. This in turn would mean that Prairie's accounts receivables, following the contract's expiration, would be negligible. Finally, the PFS does not include mention of a $1,247,000.00 loan that Prairie owed PeopleFirst. Therefore, it is not clear what the value of the Debtor's ownership interest in Prairie was.

- Retirement accounts valued at $420,000.00. At trial, the documents introduced show that the Debtor's retirement accounts were actually valued at about $157,000.00.

To summarize, while the PFS states that the Debtor had a net worth of $6,161,000.00, in fact he had a net deficit.[4]

At trial, Mr. Kissinger stated that had FPL known of the disparity in net worth, it never would have approved the financing for the lease. The vast the difference in wealth, going from a multi-million net value to a net deficit, is clearly a "substantial untruth." *See Bogstad*, 779 F.2d at 375. Coupled with the omission of the two NCIM loan guarantees, FPL has definitively shown that the PFS was materially false.

### 2. Respecting the Debtor's Financial Condition

The PFS is clearly a document that describes the Debtor's financial condition. The information provided, the Debtor's assets and liabilities, would be "sufficient to determine financial responsibility." *Bednarsz v. Brzakala (In re Brzakala)*, 305 B.R. 705, 709 (Bankr. N.D. Ill. 2004).

---

[4] The exact figure of the deficit is not readily available given that certain information was not provided at trial. For example, at trial FPL presented that Wells Fargo had filed a proof of claim of $88,359.16, which is what Wells Fargo was owed as of the Debtor's June 2013 bankruptcy petition. This does not necessarily reflect what was owed to Wells Fargo in the spring of 2011.

### 3. On Which the Creditor Reasonably Relied

Whether a creditor reasonably relied on a financial statement is determined on a case by case basis. *In re Bonnett*, 895 F.2d 1155, 1157 (7th Cir. 1989). Even so, one way of determining reasonable reliance is to examine whether the creditor followed its own established lending procedures. *See Selfreliance Fed. Credit Union v. Harasymiw (In re Harasymiw)*, 895 F.2d 1170, 1174 (7th Cir. 1990); *see also Bailey*, 145 B.R. at 932. Reasonable reliance, however, is not to be used "to second-guess a creditor's lending decision[.]" *In re Morris*, 223 F.3d 548, 553 (7th Cir. 2000). Similarly, "the concept of reasonable reliance does not generally require creditors to conduct an investigation prior to entering into agreements with prospective debtors[.]" *Id.* at 554. "A lender cannot, however, ignore evidence of deceit and expect a court to later grant an exception to the debtor's discharge." *In re Hudgens*, 149 Fed.Appx. 480, 485 (7th Cir. 2005); *see also Bogstad*, 779 F.2d at 372 n.4.

Here, Mr. Kissinger testified that FPL relied on the Debtor's PFS when making the loan and would not have approved it if the Debtor's actual financial information had been provided. Mr. Kissinger explained that FPL regularly requires guarantors, like the Debtor, to provide their financial information. FPL reviews the information and then uses it to determine if the guarantor is able to guarantee the loan should the business fail to do so. Mr. Kissinger reviewed the Debtor's PFS. According to him, nothing in the document presented any red flags or warranted further investigation. The Debtor, however, presents three challenges to this assertion.

First, the Debtor argues that FPL could not have relied on the PFS because there is a mathematical error on page 2 of the PFS. The Debtor's total assets were listed as $11,272,000.00, when the actual total, based on the figures provided, should have been $10,272,000.00. The Debtor claims that because this error did not bother FPL, nor raise any "red

9

flags," then FPL must not have relied on the document nor could they have reasonably relied on it. At trial, Mr. Kissinger stated that he totaled the columns and saw that they were exactly one million dollars off. He explained that he "figured that was an honest mistake. There was still significant -- based on that calculation, significant net worth." Transcript, p. 284. Likewise, even the Debtor agreed that "[t]his is not evidence of a vastly overstated net worth." Rao Kilaru's Response to Financial Pacific Leasing's Closing Brief, Dkt. 85, p. 13. As such, because the values were exactly $1 million off, the assumption that it was an honest mistake is reasonable. Moreover, the mistake did not substantially alter the Debtor's presentation of his assets. The PFS still demonstrated that the Debtor had a substantial net worth and nothing presented in the PFS would have raised a "red flag."

Next, the Debtor argues that, apart from the mathematical error described above, there were other red flags that FPL simply ignored. The Debtor points to the fact that Brickhouse provided the Debtor's credit report to FPL. The report indicated that the Debtor had several risk factors, including delinquencies and too many inquiries. These "red flags" should have required FPL to investigate the Debtor's finances, which FPL decided not to do. At trial, Mr. Kissinger admitted that the report was provided but that he did not read it. Mr. Kissinger stated that FPL does not rely on reports from that particular reporting agency when determining whether to lend. Mr. Kissinger explained that FPL did not like the way that this reporting agency conducted its investigation and that FPL did not find it reliable in the past. Moreover, FPL was in the business of sub-prime lending which meant that its customers typically had a number of delinquencies or inquiries before they approached FPL. These are of no concern to FPL so long as there was no default. Rather, FPL relied on its own methodology of calculating a borrower's credit worthiness. This included looking at the borrower's personal financial statement, as it did here.

Mr. Kissinger said that he saw the Debtor's PFS and that he determined that it raised no red flags. The Court is not in the business of second guessing FPL's methodology. *See Morris*, 223 F.3d at 553. Nor can the Court say that FPL was actively ignoring potential warning signs. As explained, FPL was actively following its guidelines and they showed no concern with the information that the Debtor provided.

Finally, the Debtor points to a discrepancy in the creation date of the PFS. The financing here was approved on May 6, 2011. At trial, the Debtor explained that he created the PFS on May 1, 2011 and did not submit it until after the decision was made. Therefore, the Debtor argues that transmitting the PFS was merely a formality.

As support, the Debtor points to Mr. Stanton's testimony. He stated that they created the PFS on May 1, 2011. However, Mr. Stanton also stated that the basis for this assertion was that the document appeared to have been dated May 1, 2011, and that they would not have allowed its date to be inconsistent with the date that it was prepared.

FPL, on the other hand, argues that the PFS was created on March 1, 2011, was faxed to Brickhouse on March 9, 2011, and Brickhouse then emailed it to FPL. First, FPL claims that the PFS actually says "Mar," not "May." To support this contention, FPL points to the top of the PFS which includes Prairie's name, its fax number, and a time stamp stating "Mar 09 2011 11:21 AM." At trial, the Debtor acknowledged that the fax number at the top of the page belonged to Prairie. The Debtor was adamant that he signed the PFS on May 1, 2011, however he also said that he had no explanation for the March 9, 2011 timestamp. Moreover, at trial Mr. Stanton did admit that the date on the PFS could possibly be "Mar 1," instead of "May 1."

FPL next presented an email from Brickhouse employee Dustin Christianson to Mr. Kissinger at FPL that is dated March 9, 2011 at 3:57 PM, and a subsequent email that forwards

11

the email from Mr. Kissinger to "Additional Information" on March 9, 2011 at 4:24 PM. In the first email, Mr. Christianson states that the email includes the PFS and 2008 corporate taxes. In the email's caption, however, there is no indication that anything is attached to it. At trial, Mr. Christianson testified that Brickhouse's servers crashed in 2013 and therefore they have no available records of what was emailed prior to the crash. The forwarded email, on the other hand, shows that "2008 Corporate Taxes_Prairie.pdf; PFS.pdf," presumably the corporate taxes and PFS referred to, are attached.

The Court acknowledges that the date on the PFS could either say "May" or "Mar." The Court is not an expert in deciphering handwriting and, therefore, cannot say whether the document was dated in May or March. On the other hand, it is evident that Prairie faxed this document on March 9, 2011. The Debtor has no explanation for that timestamp. Moreover, communications between Brickhouse and FPL show that a "PFS.pdf" was transmitted between the two entities on that same day and in relation to the Debtor's financing request. As a result, the Court finds that it is more likely that the PFS was created and transmitted in March than in May. Consequently, the Court finds that FPL did in fact reasonably rely on the Debtor's PFS.

### 4. Made or Published with the Intent to Deceive

In his closing argument, the Debtor concedes that he published the PFS. *See* Rao Kilaru's Response to Financial Pacific Leasing's Closing Brief, Dkt. 85, p. 16. The Debtor does dispute whether the PFS was made or published with the intent to deceive.

"[A] party can prove an intent to deceive through direct evidence." *In re Sheridan*, 57 F.3d 627, 633 (7th Cir. 1995). Alternatively, "wrongful intent may 'logically be inferred from a false representation which the debtor knows or should know will induce another to make a loan.'" *Id* (citing *In re Kimzey*, 761 F.2d 421, 424 (7th Cir. 1985)). Finally, "[a] debtor's intent to

deceive may also be demonstrated by showing reckless indifference to, or reckless disregard for, the accuracy of the information in a financial statement." *In re Contos*, 417 B.R. 557, 565 (Bankr. N.D. Ill. 2009); *see also Phillips v. Napier (In re Napier)*, 205 B.R. 900, 907 (Bankr. N.D. Ill. 1997). "Whether to infer the requisite intent is left to the bankruptcy court that presides over the case." *Sheridan*, 57 F.3d at 634.

The Debtor argues that he prepared the PFS for PeopleFirst. Later, when Brickhouse requested a personal financial statement, the Debtor merely sent them the existing PFS. The Debtor claims that at all times he believed that the PFS contained good faith estimates of his finances, that he did not try to hide anything, and that he never intended to deceive. It is irrelevant that the Debtor created the PFS for PeopleFirst and had no intention to deceive in its creation. What is relevant is whether the Debtor knew that the PFS was false, or showed reckless indifference for its accuracy, and decided to transmit it to Brickhouse anyway in the hopes of getting the financing. The evidence at trial demonstrates just that.

The evidence at trial clearly indicated that the Debtor knew that the information in the PFS was either false, incomplete, or both. First, despite containing a section on "Contingent Liabilities," the Debtor did not include the Wells Fargo and US Bank loans, which he had personally guaranteed.

Second, numerous assets were actually owned jointly with the Debtor and his wife, such as the 305 Westridge Rd. property, or were owned solely by the Debtor's wife, such as the 505 N. Lake Shore Dr. property which was in a trust for her benefit. Other property, like the non-readily marketable stock, comingled the Debtor's property with that of his wife. Finally, other real estate was listed as owned entirely by the Debtor but was really owned by the Debtor's companies.

The PFS did contain a section which allowed the Debtor to include his wife but he did not. Nor did he state that he included his companies' assets as his own. In short, the PFS purported to be the Debtor's Personal Financial Statement but actually included property that did not belong solely to the Debtor.

Third, the values of the assets were inflated. The 305 Westridge Rd. property, for example, was appraised in December 2010 for a value of $750,000.00. Despite admitting that there was no substantial change to the property since the appraisal, the Debtor increased its value on the PFS by $100,000.00. The Debtor explained that the increase was a good faith estimate of the likely increase in value since the appraisal was conducted. The Court, however, does not believe that such a significant increase in such a short period of time was a "good faith" estimate.

Finally, as Mr. Stanton explained, the Debtor reviewed the PFS prior to signing it. The Debtor knew what was on the PFS. He knew its accuracy, or lack thereof, and he decided to publish it to Brickhouse/FPL nonetheless. As a result, the Court concludes that the Debtor either knew that the PFS was inaccurate when he transmitted it to Brickhouse/FPL, or had a reckless indifference for its accuracy.

The evidence also showed that the Debtor knew that the PFS was necessary for the Debtor to obtain the financing. Although the Debtor said no one ever informed him that the information in the PFS would be relied on, it is impossible to believe that the Debtor did not know that a personal financial statement, when requested, is a consideration for securing financing. The Debtor testified that he has been involved in over 75 loan applications at PeopleFirst. Even if the Debtor never personally reviewed a personal financial statement, he did know that the Bank reviewed them and used them when recommending a loan for approval.

Furthermore, FPL demonstrated that in the spring of 2011, the Debtor became

14

increasingly desperate for financing. There was sufficient evidence to show that the Debtor may have known that Prairie was going to close down and that he was trying to get his new venture, NCIM, started. Evidence showed that he was borrowing heavily, e.g. the Wells Fargo and US Bank loans, to fund NCIM. There was also evidence that the Debtor was unable to get additional funding at "prime" lending institutions and therefore had to turn to "sub-prime" lending. Finally, at trial the Debtor admitted that while he used Prairie as the leasee, the leased equipment actually went to NCIM. The Debtor explained that he did so because no one would lend to NCIM, which had no credit or business history at the time, but they would lend to an established entity like Prairie. The fact that the Debtor blatantly lied on the application to secure financing is a clear indication of intent to deceive. Furthermore, while the Debtor claims that Brickhouse and FPL knew that the lease was for NCIM, no evidence to support such a claim was presented. Neither the FPL nor Brickhouse representative at trial knew that the lease was actually for NCIM. Moreover, they also stated that they would never approve a lease agreement for one entity and have the equipment go to another.[5]

Lastly, the Debtor argues that the fact that the Debtor subsequently made payments on the lease for about a year demonstrates that he lacked the intent to deceive. The Court disagrees. Whether the Debtor made or wanted to make payments is irrelevant to the inquiry. The inquiry here is whether the Debtor published the PFS with the intent to deceive Brickhouse/FPL into providing the financing. Just because payments were actually made does not overcome the fact that the Debtor tricked Brickhouse/FPL into providing the financing in the first place.

Therefore, the Court finds that the Debtor published his PFS with the intent to deceive his creditors. As a result, FPL has satisfied all the elements of section 523(a)(2)(B) to prove that its

---

[5] Indeed, FPL stated that it wanted to make sure it knew who was using the equipment and where it was located. The lease agreement itself had strict requirements for such. Any assignment or sublease was prohibited. Moreover, approval was necessary before a change of ownership could occur. *See* FPL Ex. 7, ¶ 2.

debt is nondischargeable.

### 5. Amount

The parties also dispute the amount of debt that should be nondischargeable. As an initial matter, the Court notes that FPL filed a proof of claim for an amount of $144,026.87 based on the outstanding balance on its loan plus interest. That claim has not been objected to and, under the Code, it is deemed allowed in full. *See* § 502(a) ("A claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest . . . objects."). Furthermore, section 523(a)(2) provides that a debt, "to the extent it was obtained by" the criteria listed in subsection (B), is nondischargeable in full. § 523(a)(2)(B). Indeed, the phrase "encompasses any liability arising from money, property, etc., that is . . . obtained" by the means prescribed under section 523(a)(2)(B). *Cohen v. de la Cruz*, 523 U.S. 213, 223 (1998).[6] This includes, where applicable, "treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor." *Id.*

FPL claims that it is owed $126,030.15 as the balance due under the loan; $1,262.30 in late charges; $37,742.06 in accrued prejudgment interest as of December 14, 2015; still accruing prejudgment interest, and attorney's fees, less a payment of $46,000.00 that it received from the Debtor's wife (a co-signer on the personal guaranty), and $12,510.00 as proceeds of the sale of the equipment. The total claim, therefore, that is nondischargeable is $106,524.51 plus attorney's fees and accrued prejudgment interest.

### B. Rule 15(b)

Because the Court finds that the Debtor's debt to FPL is non-dischargeable under § 523(a)(2)(B), the Court need not consider whether FPL can amend its complaint to include a

---

[6] *Cohen* specifically dealt with § 523(a)(2)(A). However, because the phrase "to the extent obtained by," which the Supreme Court was interpreting, precedes both §§ 523(a)(2)(A) and (a)(2)(B), the case is equally applicable here.

count under § 523(a)(2)(A) or if it met its burden under that section.

## IV. CONCLUSION

For the aforementioned reasons, the Court finds that the Debtor's debt to FPL, $106,524.51 plus attorney's fees and accrued prejudgment interest, is nondischargeable under 11 U.S.C. § 523(a)(2)(B). A separate judgment will be issued.

DATED: May 25, 2016

_____
Bruce W. Black
United States Bankruptcy Judge